***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. This dispute arises from an incident, which occurred on January 23, 2000, where plaintiff was injured in an admittedly compensable work related accident. He apparently fell on a speed bump covered in ice while walking across a parking lot. Defendant accepted this claim as compensable. Defendant-carrier provided medical treatment at that time. Mr. Smith was placed at maximum medical improvement and was released. He did not miss any time from work, and therefore he was not compensated for any loss time. Subsequently, in 2001, plaintiff made a request for additional medical treatment for RSD, which he claimed was related to the January 23, 2000 injury. Defendant denied this request pursuant to a Form 61 filed on August 27, 2001.
2. Plaintiff did not miss any time from work for defendant-employer after the January 23, 2000 accident, but stopped working for defendant-employer in 2001 due to his RSD.
3. All parties are properly before the Commission, and the Commission has jurisdiction of the parties and of the subject matter.
4. On January 23, 2000, plaintiff was employed by defendant-employer at an average weekly wage to be determined by a Form 22, and all parties and their employees were bound by and subject to the provisions of the North Carolina Workers' Compensation Act. An employment relationship existed between plaintiff and defendant-employer at the time of the incident of January 23, 2000, as plaintiff was employed as a Deputy Sheriff for defendant-employer.
5. Defendant-carrier Sedgwick of the Carolinas was the carrier of defendant-employer's workers' compensation insurance at the time of the incident claimed by plaintiff.
6. Plaintiff and defendant are subject to the provisions of the North Carolina Workers' Compensation Act.
7. A Form 19 was filed with the Commission on February 2, 2000.
8. A Form 18 was filed with the Commission on September 11, 2001, and a second Form 18 was filed with the Commission on October 17, 2001.
9. A Form 61, Denial of Plaintiff's Request for Further Medical Treatment, was filed with the Commission on August 27, 2001.
10. A Form 33 was filed with the Commission on December 7, 2001.
11. A Form 33R was filed with the Commission on January 18, 2002.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner in this matter, plaintiff was 44 years old. Plaintiff became employed with the Pitt County Sheriff's Department in June 1981. Plaintiff began as a worker in the communications division then worked as a deputy sheriff in the night car, an investigator, shift leader/investigator, lieutenant, sergeant and chief of detectives in narcotics as well as starting the dive team and working on rescue, SWAT and junior cadets programs.
2. In 1989, while responding to a domestic violence call, plaintiff suffered a work-related injury to his left knee. This injury is not the subject of this claim. As a result of plaintiff's 1989 injury to his left knee cap, plaintiff underwent arthroscopic surgery. Within a very few days of his surgery plaintiff developed reflex sympathetic dystrophy (hereafter "RSD") also known as regional pain disorder. Over the course of the following year, plaintiff developed burning in his left leg from the kneecap down. The problem intensified, the hair fell out of plaintiff's leg and his leg atrophied. Plaintiff went through a series of injections and eventually was sent to Bowman Gray Hospital where he was hospitalized for ten to twelve days and was given continuous block infusions.
3. Following plaintiff's treatment at Bowman Gray, his left leg from the kneecap down improved, the burning left, the hair grew back and the atrophy disappeared. Plaintiff's leg no longer twitched or burned and he was in most respects pain free. After being out of work for approximately one year, plaintiff returned to his previous work. Plaintiff chased criminals, worked with the dive team and worked 20 to 24 hour days when necessary. Plaintiff did continued to have some residual burning but it was of an entirely different magnitude than it had been before and did not limit plaintiff's activities. From 1993 through January 2000, plaintiff performed all the duties of a master sergeant. Mack Manning, the sheriff of Pitt County indicated that between 1993 and 2000 plaintiff performed all of his regular duties and never made mention of any physical problems, manifested no physical pain or difficulty performing physical tasks.
4. Plaintiff had dreamed of working for the sheriff's office since he was a child. Plaintiff's passion was his work with the deputy sheriff's office, and he gained much of his self-esteem from performing those duties. Plaintiff's personality tends to be stoic. His personality and character are such that he tends to ignore or deny pain until it is disabling.
5. On January 23, 2000, plaintiff was working an adult rave party on a 20-hour shift for security. Plaintiff had volunteered for this job. In general plaintiff was a workhorse and would work almost around the clock with no complaint. The evening was cold and icy and there was icy precipitation. Plaintiff observed a fight in line and stepped out of his patrol car in order to stop the fight. When plaintiff stepped out he slipped and fell on the ice and landed on his back on the raised surface of a speed bump.
6. Plaintiff initially thought he had broken his back and was paralyzed. However, after a few minutes he pulled himself up on the front bumper of his patrol car and finished his shift.
7. Plaintiff returned home and was reluctant to go to the doctor even though he continued to be in pain. Finally after his wife insisted that he go to the doctor, he called defendant-employer and was referred to Urgent Care Center. Plaintiff received pain medications and underwent an MRI, which was essentially normal.
8. Defendant-employer accepted plaintiff's January 23, 2000 injury as compensable.
9. Plaintiff did not lose any time from work following his January 23, 2000 fall. Plaintiff wanted to return to work as his job with the sheriff's department "was his life". Over the next two months following plaintiff's January 23, 2000 injury, plaintiff continued to have low back pain, leg and hip pain. Within two to three months following his compensable January 23, 2000 injury, plaintiff began to have burning in his left foot and his left foot began swelling. Plaintiff bought shoes two sizes larger than his regular size so that he could wrap his feet inside his shoe to attempt to alleviate the burning and pain. By Spring 2000, plaintiff was unable to go fishing due to his pain.
10. Within three to four months following his compensable January 23, 2000 injury, plaintiff noticed that he was experiencing hair loss in his left leg and left chest and his feet continued to burn as well. By approximately four months following his compensable injury, plaintiff noticed discoloration in his left foot. Around this time plaintiff also noticed that his left foot would feel cold. Plaintiff continued to experience pain in his lower back, left leg and hip. The burning that plaintiff experiences is severe and feels as if he is on fire.
11. Approximately nine months following plaintiff's compensable fall, he began to experience leg weakness followed approximately one month later by foot and leg tremors.
12. During this time plaintiff continued to work and perform his regular duties. However, he often had an obvious limp, which was also observed by his wife and the sheriff. Plaintiff occasionally mentioned his pain. The sheriff noted that plaintiff's left leg was weak and that he would hobble. Following plaintiff's return from his original injury, the sheriff does not remember plaintiff ever limping and does not remember plaintiff complaining of discomfort or pain.
13. Plaintiff's symptoms gradually worsened and he became unable to ignore them. He became less able to perform his job and unable to sleep.
14. Eventually plaintiff's hip and lower back pain was so intense that he would beat on his hips in his sleep to get the pain to go away. Plaintiff did this to the point that he bruised himself. Finally, at the insistence of his wife, on March 22, 2001, plaintiff presented to Dr. Anthony Breuer, a neurologist. Plaintiff presented to Dr. Breuer complaining of left hip pain, left burning dysesthesias in a stocking distribution and diminished sensation. Dr. Breuer obtained an x-ray of the left hip, a MRI of the lumbar spine and a complete blood count including a sedimentation rate. The results of these tests were all normal. Plaintiff was treated conservatively. After plaintiff's symptoms continued and worsened, plaintiff was referred by Dr. Breuer to Dr. Lynn Johnson, an anesthesiologist with a specialty in pain medicine for treatment of his chronic pain.
15. On April 26, 2001, plaintiff presented to Dr. Johnson complaining of pain in the left hip and leg associated with swelling, hair pattern growth changes, shrinking of his left leg and within the last month a right-hand tremor. Dr. Johnson was of the opinion that these were RSD symptoms and also questioned whether some of the symptoms were the result of conditions in plaintiff's spine, which were revealed on the MRI as degenerative disc disease, bulging disc and possible radiculitis. Plaintiff was prescribed Neurontin and given three lumbar epidural steroid injections. In June 2001, plaintiff was admitted inpatient to have an epidural infusion catheter inserted. The infusion was unsuccessful. Plaintiff continued to have the same symptoms and developed a noticeable asymmetry of temperature with the left leg being cooler than the right and an obvious hair loss from the left leg. Dr. Johnson referred plaintiff to Dr. Richard L. Rauck, a board-certified anesthesiologist and pain medicine doctor.
16. Plaintiff presented to Dr. Rauck on September 18, 2001. Dr. Rauck was of the opinion that plaintiff suffered from RSD and back and hip pain. Dr. Rauck was of the opinion that plaintiff should consider a continuous lumbar catheter, and if that did not work a spinal cord stimulator and referred plaintiff back to Dr. Johnson.
17. On July 10, 2001, plaintiff presented to Dr. David W. Frazier, a cardiologist, complaining of nearly passing out and dizziness. Plaintiff indicated that he had these symptoms for approximately 20 years. Following the installation of a monitor, Dr. Frazier found no definite evidence of any cardiac abnormality and prescribed plaintiff Toprol, a beta-blocker. Dr. Frazier's opinion is that plaintiff's heart condition, if any, has no relation to plaintiff's RSD or his fall on January 23, 2000.
18. On August 2, 2001, plaintiff saw Dr. Douglas Jones, a board-certified neurosurgeon, on referral from Dr. Johnson. After considering plaintiff's symptoms of low back pain, left hip pain and symptoms of RSD, which included swelling, loss of hair in left leg, change in coloration of left leg, hot feelings in the left leg and plaintiff's pain level, Dr. Jones was of the opinion that plaintiff should undergo an epidural. On August 21, 2001, Dr. Jones placed a Dupens epidural catheter in plaintiff. Plaintiff did not obtain relief from this procedure.
19. On October 29, 2001, Dr. Jones consulted with plaintiff who continued to have chronic pain in his left leg, sores on his foot and a tremor in his right arm. At that time Dr. Jones was of the opinion that plaintiff should have a trial of a dorsal column stimulator.
20. On November 16, 2001, plaintiff returned to Dr. Rauck on referral from Dr. Johnson regarding an opinion on whether or not plaintiff was a candidate for a spinal cord stimulator. At that time plaintiff's symptoms were worsening and plaintiff had developed a subcutaneous ganglion cyst on his left foot and an odd rash as well as clawing of the toes. Dr. Johnson was of the opinion that this was a part of the progression of plaintiff's RSD to the second and third stages where a plaintiff develops more atrophic changes of the limb.
21. On November 16, 2001, plaintiff presented to Dr. Rauck with significant pain in his lower extremity and extreme sensitivity in both upper extremities. Plaintiff's left leg was hot and swollen and his toes were beginning to turn under. Dr. Rauck was of the opinion at that time that plaintiff had RSD in stage two or three as well as chronic pain syndrome and agreed plaintiff was a candidate for a spinal column stimulator.
22. On November 28, 2001, Dr. Johnson attempted to place a spinal catheter in plaintiff but the attempt was unsuccessful. At that time plaintiff's RSD symptoms had spread to his left hand and plaintiff was experiencing spasms, tremors and dystonia. Thereafter, plaintiff was referred to Dr. Jones for placement of the dorsal column stimulator, which was placed on January 11, 2002.
23. Plaintiff continues to be treated by Dr. Johnson. His RSD symptoms have "spread" and include burning in both feet, more dystonia and tremor movements, increased burning in the feet, burning of the left forearm and hand, plaintiff's condition has spread to the right leg and right foot, plaintiff has shaking tremors of the arm and leg and plaintiff has significant sleep disturbance. Plaintiff's symptoms continued to worsen. Dr. Johnson was of the opinion that plaintiff is totally and permanently disabled and will require medical treatment for the rest of his life including medications, medical management, possibly a new spinal column stimulator and may at some point need attendant care. Plaintiff is currently on Gabitril, Oxycotin and Serax. At the time of his deposition, Dr. Johnson was of the opinion that plaintiff was in Stage Two RSD.
24. On January 18, 2002, plaintiff was seen by Dr. Frank Flemming, a neurologist, at the request of the North Carolina Disability Determination Services Board. Plaintiff presented with severe pain, had a history of falling, required the use of a cane and had the recent development of burning, discomfort and coldness in his left upper extremity. The doctor observed a tremor in plaintiff's right lower extremity, tremors in his hands, voice and face, hair loss of the left chest wall, a peculiar walk with tremulous legs and on the left lower extremity, scars, skin discoloration, hypersensitivity and no reflexes. Dr. Flemming was of the opinion that plaintiff had RSD, was unable to perform his deputy sheriff's job and was permanently and totally disabled and unable to perform any work at all.
25. On October 10, 2002, plaintiff presented to Dr. Edwin Cooper, an orthopaedic surgeon, for an evaluation. Dr. Cooper was of the opinion that plaintiff had RSD in the left lower extremity, right lower extremity and left upper extremity. Dr. Cooper was of the opinion that plaintiff's bulging disc at L3-4 was caused by his January 23, 2000 compensable fall and that the symptoms plaintiff had in his thigh and hip were consistent with the symptoms, which would show from a L3-4 bulging disc. Dr. Cooper noted jerky movements in plaintiff, irregular speech, difficulty in walking, left foot cooler than right, curling of number two and number four toes, decreased sensation in the left knee and hair loss on the left lower leg. Dr. Cooper was of the opinion that plaintiff's tremor is related to his RSD including the tremor of his head and voice. Dr. Cooper is also of the opinion that plaintiff's speech problems are also due to his RSD. Plaintiff's concentration problems are caused by his continuous pain, which is a result of his RSD.
26. On February 14, 2003 at the request of defendants, plaintiff was evaluated by Dr. Kern Carlton, a board-certified physical medicine and rehabilitation specialist. Dr. Carlton was of the opinion that plaintiff has RSD in both lower extremities but would need more diagnostic evaluation to determine whether or not plaintiff's upper extremity problems are related to RSD or are cervical in nature.
27. After reviewing all the evidence including the medical records, testimony of plaintiff's doctors and testimony of the witnesses, the undersigned have determined that plaintiff is credible. Although plaintiff's medical records vary in indication of when plaintiff's symptoms of RSD began following his January 23, 2000 compensable injury, taking into account plaintiff's overwhelming desire to work as a deputy sheriff, his tendency to want to work in spite of being in pain or being over worked and his general desire to diminish or ignore his pain, the undersigned accepts as credible plaintiff's indication that following January 23, 2000 he continued to experience hip, back and leg pain and that within two to three months following that injury began to experience symptoms of RSD in his left lower extremity.
28. Dr. Lynn Johnson estimated that approximately five percent of his patients have RSD. He was of the opinion that plaintiff's RSD symptoms for which he began treating plaintiff in April 2001 were caused by plaintiff's compensable January 23, 2000 fall. Dr. Johnson was also of the opinion that plaintiff's radiculitis is also caused by plaintiff's compensable fall. Dr. Johnson was further of the opinion that RSD occurs as a result of some type of nerve injury. He was further of the opinion that while RSD can spontaneously recur without injury, this is rare and none of his patients have ever had a spontaneous reoccurrence. He was further of the opinion that it is much more likely that plaintiff's RSD symptoms, which occurred and gradually increased in 2001 were caused by plaintiff's fall than a spontaneously recurring RSD. Finally Dr. Johnson was of the opinion that plaintiff is totally and permanently disabled from work.
29. Dr. Flemming was of the opinion that plaintiff had RSD and that he is permanently and totally disabled from work. Dr. Flemming has treated at least 100 patients with RSD and has never seen a case of a spontaneous reoccurrence of RSD with no inciting event.
30. Dr. Jones was of the opinion that it would be rare, though possible, for a fall such as plaintiff's January 23, 2000 fall to produce RSD. However, he was of the opinion that plaintiff's compensable fall could have caused a significant traumatic condition that might have triggered plaintiff's painful condition and caused an exacerbation of his RSD.
31. Dr. Rauck was of the opinion that plaintiff's RSD was caused by his first injury but that plaintiff's fall may have exacerbated his RSD. Dr. Rauck was of the opinion that RSD symptoms can escalate over time. He was further of the opinion that if plaintiff have had relatively minimal symptoms for approximately seven years since his first case of RSD, it was more likely for plaintiff's subsequent RSD to have been brought on by trauma than to have a spontaneous recurrence.
32. Dr. Cooper was of the opinion that plaintiff's RSD was a direct and proximate result of his January 23, 2000 fall at work and not a pre existing condition. He was further of the opinion that plaintiff's lumbosacral strain with bulging disc at L3-4 was also caused by plaintiff's compensable fall and resulted in lumbar radiculopathy. Dr. Cooper was of the opinion that plaintiff was 100% disabled from any type of work. Dr. Cooper was of the opinion that it was not uncommon for RSD symptoms to take several months to develop. Trauma is the most common cause of RSD. While spontaneous reoccurrence of RSD is possible, there are a very small number of cases of spontaneous recurrence and usually the recurrence will be in the first few years. Dr. Cooper has never seen a case of spontaneous recurrence. Dr. Cooper was of the opinion that it is much more likely that plaintiff's RSD is the result of his compensable January 23, 2000 fall than a spontaneous recurrence. Dr. Cooper was of the opinion that even a temporary bruising of plaintiff's spinal cord caused by falling on the speed bump would be sufficient to cause RSD. Dr. Cooper was of the opinion that plaintiff would continue to need medical treatment throughout his life including the services of neurologists, psychologists and pain doctors as well as continuing medication. Dr. Cooper is of the opinion that plaintiff is not capable of working now or in the future as his disease has greatly progressed over the last three years.
33. Dr. Carlton was of the opinion that it is more probable than not that plaintiff's January 23, 2000 compensable injury led to plaintiff's left lower extremity RSD. He is further of the opinion that plaintiff also has RSD in his right leg and that tremors can be caused by RSD. Dr. Carlton has seen cases of back injuries, which develop RSD in the extremity. He is also of the opinion that RSD can spread from extremity to extremity. Dr. Carlton has never had a patient, which had a spontaneous recurrence of RSD without a traumatic incident. Dr. Carlton was of the opinion that it was more likely than not that plaintiff's RSD, which manifested itself in 2001, was caused by his January 23, 2000 fall.
34. On January 23, 2000, plaintiff sustained a compensable injury by accident.
35. As a direct and proximate result of plaintiff's January 23, 2000 compensable injury by accident, plaintiff sustained RSD (chronic regional pain syndrome) as well as a bulging disc at L3-4 with radiculitis.
36. As a direct and proximate result of plaintiff's compensable January 23, 2000 injury and the resulting RSD, and bulging disc and radiculitis, plaintiff has been unable to work and earn wages in any capacity for defendant or any other employer from March 21, 2001 and continuing.
37. Plaintiff's average weekly wage is $1,000.18, yielding the maximum compensation rate for 2000 of $588.00.
38. As a direct and proximate result of plaintiff's compensable January 23, 2000 injury and the resulting RSD, and bulging disc and radiculitis, plaintiff is entitled to temporary total disability compensation at the rate of $588.00 per week from March 21, 2001 and continuing.
39. Plaintiff is totally and permanently disabled.
40. Plaintiff is entitled to have defendant provide all medical compensation arising from plaintiff's compensable injury.
41. Plaintiff's extremity symptoms including tremors are related to his RSD, as are the tremors in plaintiff's head and speech difficulty. Plaintiff's concentration problems are also a result of his compensable injury.
42. It has not been proven by the greater weight of the evidence that plaintiff's heart problems, cervical spine problems, and ganglion cyst are a result of his compensable injury.
43. The treatment and evaluations which plaintiff has received for his lower back condition and RSD were related to his compensable injury and were reasonably necessary to evaluate and provide treatment and relief from these conditions.
44. Plaintiff is entitled to have defendant provide all medical compensation arising from this treatment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage is $1,000.18, yielding the maximum compensation rate for 2000 of $588.00. N.C. Gen. Stat. §97-2(5).
2. On January 23, 2000, plaintiff sustained a compensable injury by accident. As a direct and proximate result of plaintiff's January 23, 2000 compensable injury by accident, plaintiff sustained RSD (chronic regional pain syndrome) as well as a bulging disc at L3-4 with radiculitis. N.C. Gen. Stat. §97-2(6).
3. As a direct and proximate result of plaintiff's compensable January 23, 2000 injury and the resulting RSD, bulging disc and radiculitis, plaintiff has been unable to work and earn wages in any capacity for defendant or any other employer from March 21, 2001 and continuing. As a direct and proximate result of plaintiff's compensable January 23, 2000 injury and the resulting RSD, bulging disc and radiculitis, plaintiff is entitled to temporary total disability compensation at the rate of $588.00 per week from March 21, 2001 and continuing hereafter until he returns to work or until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff's extremity symptoms including tremors are related to his RSD, as are the tremors in plaintiff's head and speech difficulty. Plaintiff's concentration problems are also a result of his compensable injury. Plaintiff is entitled to have defendant provide all medical compensation arising from plaintiff's compensable injury, which tends to effect a cure, provide relief or lessen the period of disability. N.C. Gen. Stat. §§ 97-25, 97-25.1.
5. The treatment and evaluations which plaintiff has received for his lower back condition and RSD were related to his compensable injury and were reasonably necessary to evaluate and provide treatment and relief from these conditions. Plaintiff is entitled to have defendant provide all medical compensation arising from this treatment. N.C. Gen. Stat. §§ 97-25, 97-25.1.
6. It has not been proven by the greater weight of the evidence that plaintiff's heart problems, cervical spine problems, and ganglion cyst are a result of his compensable injury. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $588.00 per week from March 21, 2000 and continuing. Portions of this amount have accrued and shall be paid in a lump sum subject to the attorney's fee approved in Paragraph 2 of this Award.
2. A reasonable attorney's fee of 25% of the compensation due plaintiff is approved for plaintiff's counsel and shall be paid by defendant directly to plaintiff's counsel as follows: 25% of the accrued amount due plaintiff shall be deducted and paid to plaintiff's counsel, thereafter, plaintiff's attorney shall receive every fourth check.
3. Defendant shall pay all medical expenses incurred by plaintiff as a result of his compensable injury.
Defendant shall pay the costs.
This the 25th day of August 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DCS/llc